IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LAPORTE PIGMENTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 00-0329-CV-W-5 |
| | ) | |
| AXEL J., L.P., | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pending before the Court is Plaintiff Laporte Pigments, Inc.'s ("Laporte") Motion for a Preliminary Injunction [Doc. # 5]. The motion is denied. The Court makes the following findings of fact and conclusions of law.

**I.    Background**

This is a patent infringement suit. Laporte Pigments, Inc. ("Laporte") is a Delaware corporation with its principal place of business in Maryland. It is the assignee of certain rights in United States Patent No. 4,946,505 (the '505 patent), which discloses a method for manufacturing pigment granules, and using them to color concrete. Laporte received its assignment of rights in the '505 patent from Chemische Werke Brockhues, AG ("Brockhues"). Using the '505 patent, Laporte manufactures a granular concrete pigmenting additive, marketed under the name "Granufins." Laporte's "Granufins" is sold

to a variety of concrete manufacturers throughout the United States who in turn use it to color concrete.

Defendant Axel J., L.P. ("Axel") is a Canadian company. Its principal, Dr. Axel Jungk, was formerly one of Brockhues' technical experts, and is the named inventor under the '505 patent. Axel manufactures a granular additive under the trade name AXEL'SMARTLINS that is also used to color concrete. Recently, Axel began selling AXEL'SMARTLINS to U.S. concrete manufacturers in direct competition with Laporte's Granufins product. At least one shipment of AXEL'SMARTLINS was purchased by Pavestone, Inc., a Laporte customer. The shipment was sent to Pavestone's manufacturing facility located in Lee's Summit, Missouri, and was used there to manufacture colored paving stones.

Laporte claims that the use of AXEL'SMARTLINS infringes the method disclosed in the '505 patent, and thus the manufacture and sale of AXEL'SMARTLINS to Pavestone, Inc., constitutes inducement to infringe, in violation of 35 U.S.C. 271(b). Laporte filed suit in this court to enjoin Axel's infringement and for damages.

On June 5, 2000, a hearing was held on Laporte's Motion for a Preliminary Injunction. Because interpretation of the '505 patent is an essential aspect of determining whether Laporte is entitled to such relief, the Court instructed the parties to present all evidence and arguments regarding construction of the '505 patent, in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The parties were further advised that the Court intended to make a *Markman* determination, based upon such

arguments and evidence. In addition, the parties were given an opportunity to present evidence and argument on all other factors relevant to the question of whether a preliminary injunction should issue.

## II. Discussion and Analysis

Injunctive relief is specifically authorized in patent cases by 35 U.S.C. § 283. As the moving party, Laporte must establish its right to a preliminary injunction in light of four factors: (1) reasonable likelihood of success on the merits; (2) irreparable harm if preliminary relief is not granted; (3) the balance of hardships tips in its favor; and (4) the impact of the injunction on the public interest. *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.,* 141 F.3d 1084, 1087-88 (Fed. Cir. 1998) (citing *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994)).[1] Likelihood of success and irreparable harm are threshold requirements. If either is not established, the preliminary injunction cannot issue. *Id.* at 1088. To establish a likelihood of success on the merits, Laporte must show it will likely prove at trial that (1) the '505 patent is valid and enforceable and (2) the '505 patent was infringed by Axel. *Id. (citing Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir.), *cert. denied*, 522 U.S. 963 (1997)).

---

[1] Because the question to be resolved here concerns substantive patent issues, it falls under the Federal Circuit's aegis. *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

3

## A. Reasonable Likelihood of Success on the Merits

### 1. Validity

The '505 patent is presumptively valid under 35 U.S.C. § 282. Because Axel's principal, Dr. Jungk, is the inventor of the '505 patent and bound by the assignment of the patent, Laporte contends that Axel is barred from challenging the '505 patent's validity. Under the doctrine of assignor estoppel, the patent assignor is estopped from attacking the validity of his or her own patent. *See Shamrock Tech., Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793-94 (Fed. Cir. 1990), *aff'd*, 6 F.3d 788 (1993). Axel has conceded that assignor estoppel applies, but still cites general equitable principals, such as the "clean hands" doctrine, to prove the patent's invalidity. However, if a court were to rely on the equitable principles advanced by Axel, it would render meaningless the doctrine of assignor estoppel. The Court, therefore, finds that assignor estoppel bars Axel from challenging the '505 patent's validity.

### 2. Infringement

Infringement analysis involves two steps. First, the claim is construed. After the parameters of the claim are established, it is compared to the accused process. If that comparison shows that all the claim limitations are present either literally, or by an equivalent, an infringement has occurred. *Young Dental Mfg. Co., Inc. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1141 (Fed. Cir. 1997).

4

### a. Claim Interpretation

Claim construction is a question of law for the court. *Markman*, 517 U.S. at 372; *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455 (Fed. Cir. 1998). "Claim construction begins, as it must, with the words of the claims." *Vehicular Techs.*, 141 F.3d at 1088 (citing *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995)).

Here, Laporte has asserted infringement of only Claim 1 of the '505 patent. The language of Claim 1 reads as follows:

> A process of dying concrete comprising mixing pigment-containing granules with cement and aggregate at conditions sufficient to result in a generally homogeneous dispersal of pigment in the concrete, wherein:
> 
>> pigment-containing granules other than compacted or briquette granules are used,
>> 
>> each granule consisting essentially of at least one pigment selected from the group consisting of manganese oxide and iron oxide and of at least one binder for promoting the dispersal of the pigment in the concrete,
> 
> at least 90% of the granules have a particle size of about 20 microns or more, and
> the finite water content of the granules is not in excess of about 4.2%.

('505 Patent, Column 7, lines 12-27).

The parties agree that for the most part, Claim 1 is straightforward and unambiguous. The only disputed term is the requirement that each granule include "at least one binder for promoting the dispersal of the pigment in concrete." There is no dispute regarding the meaning of the term "binder" itself. It is a substance used to bind a

minute quantity of pigment in granular form.  Several examples of commercially available binders are listed in the '505 patent specification.  *See* Col.3, lns. 37-51.

Claim 1's language specifies that the binder must serve to promote dispersal of the pigment in concrete.  Claim 1 further specifies that not just any type of pigment dispersal is desired, but rather "homogeneous dispersal."  *See* Col. 7, lns. 14-15.  As the '505 patent specification explains, one of the problems of prior art granules is that they cause "spots" and "color nests."  *See* Col. 2, lns. 27-31.  These terms refer to clumps of pigment that mar the surface of the concrete when pigment is not evenly distributed.  The '505 patent specification explains that by using its method, "[the pigment] will become homogeneously distributed in the concrete so that exposed concrete will be dyed satisfactorily without a formation of spots and color nests."  *See* Col. 3, lns. 5-7.  Accordingly, Claim 1 must be read to require a binder that promotes the homogeneous dispersal of the pigment in concrete.

A primary dispute between the parties is whether Claim 1 specifies a particular mechanism for promoting homogeneous dispersal.  Laporte argues that a binder that promotes homogeneous dispersal of pigment by any method falls within Claim 1's scope.  Axel, however, urges a more narrow reading, contending that Claim 1 requires a water-soluble binder.  Plainly, there is no water-solubility requirement expressly stated in Claim 1.[2]  Relying upon the '505 patent specification and the prosecution history, Axel argues

---

[2]Interpreting Claim 1 requires the court to give the terms in the claim their ordinary and accustomed meaning. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.

that this limitation must be read into the Claim. The Court will first address Axel's argument regarding the '505 patent specification.

Axel's expert, Dr. Carmel Jolicoeur, opined that the '505 patent specification identified water-solubility of the granule binder as a mechanism for promoting homogeneous dispersal of pigment in concrete. When the binder dissolves in the water contained in the concrete mix, he explains, pigment is released into the surrounding concrete, resulting in homogeneous pigmentation. Dr. Jolicoeur also notes that all of the examples of binders set forth in the specification are water-soluble. Because water-solubility of the binder is a mechanism for promoting homogeneous dispersal of the pigment, and all of the binders described in the specification are water-soluble, Dr. Jolicoeur testified that a person of ordinary skill in the art would understand the '505 patent to require a water-soluble binder.

Laporte responds that there is no language in Claim 1, or in the specification, limiting the invention to water-soluble binders. Further, Laporte argues that Dr. Jolicoeur is in error in contending that all of the example binders in the '505 patent specification are water-soluble. Dr. Stoffer, Laporte's expert, testified that Igepal type materials are

---

Cir. 1999) (citing *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998); *York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996)). "General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Id.* (citing *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 865-66 (Fed. Cir. 1997) (unmodified term "reciprocating" not limited to linear reciprocation); *Bell Communications Research, Inc.*, 55 F.3d at 621-22 (unmodified term "associating" not limited to explicit association); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) (unmodified term "plasticizer" given full range of ordinary and accustomed meaning).

7

sometimes water-insoluble. *See* Hearing Tr. at 106, ln. 1-p. 107, ln. 6. Igepal C is one of the binders listed in the '505 patent. *See* Col. 3, ln. 37.

The Court concludes that Laporte has the better argument on this issue, in part because the specifications indicate more than one mechanism for the binders to homogeneously disperse the pigment. The '505 specification notes that one of the main disadvantages of prior art granules was that because they were too strongly bound together, the pigment was not homogeneously dispersed: "[d]uring the mixing cycle the shear forces exerted in the concrete on the granules are not sufficient for dispersion of the pigment." *See* Col. 2, lns. 27-29. It is thus clear that to homogeneously disperse pigment, the binder must surrender the pigment at some point during the mixing process.

It appears that the '505 patent specification identifies at least two mechanisms for breaking down the binder and surrendering the pigment. First, as noted above, shear forces exerted on the granules during mixing serve to disperse the pigment, albeit in the prior art granules, the dispersal is inadequate. *See* '505 patent, Col. 2, lns. 27-29; *see also* Jolicoeur Decl., III(D)(3) (recognizing that shear forces are one mechanism of dispersal discussed in the '505 patent). Thus, the more susceptible to shear forces a binder is, the better able it is to promote dispersal. Second, the specification describes a problem with prior art granules as follows: "[t[he moisture content of the concrete and the time available are not sufficient for a dissolving of binder-containing granules." *See* '505 patent, Col. 2, lns. 42-44. Thus, the specification contemplates that moisture-solubility of the binder in

8

concrete mix is another mechanism to surrender the pigment and promote pigment dispersal.[3]

As previously noted, Claim 1's language contains no water-solubility limitation on the binder. Although the '505 patent specification explains that moisture-solubility is one mechanism of dispersing pigment, there is no indication there that even this mechanism is required. For example, it appears that a binder that promotes homogeneous dispersal of pigments by being more susceptible to breakdown by shear forces than prior art granules would fall within Claim 1. Accordingly, because multiple mechanisms are disclosed in the specification for promoting homogeneous dispersal of pigments, with no indication that any particular mechanism is required, the specification cannot be read to limit Claim 1 to a water-soluble binder.

The Court also finds Axel's arguments regarding the example-binders in the '505 patent specification unpersuasive. As previously noted, Laporte's expert testified that at least one of the example binders, Igepal C, can be water-insoluble, depending on the formulation used. Axel did not rebut this contention. Further, even if all of the example-binders were water-soluble, the Court does not believe that fact alone would limit Claim 1 to a water-soluble binder. A binder that takes advantage of both shear forces and moisture

---

[3] Based on the record before the Court, there appears to be a distinction between water-solubility and moisture-solubility in concrete mix. As both parties' experts testified, while pure water has a pH of seven, the ingredients combined with water in concrete mix lower the pH to between 12 and 13. Thus, substances that might not be soluble in pure water are soluble in the extremely basic environment of the concrete mix. The specification only uses the term "moisture," not "water," in discussing solubility of the binder.

9

solubility to promote dispersal may be the "best mode" of practicing the invention in the '505 patent. Inventors are statutorily required to disclose in the patent specification the best mode they know of practicing their invention. *See* 35 U.S.C. § 112. Accordingly, one should not be surprised to find example-binders that could utilize both mechanisms of dispersal. The Federal Circuit has repeatedly made it clear, however, that "[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations." *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301-02 (Fed. Cir. 1999) (quoting *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1068 (1989)); *SRI Int'l. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*); *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (quoting *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988)). Thus, even if all of the example-binders utilize both shear force susceptibility and moisture-solubility to promote pigment dispersal, that does not mean that Claim 1 requires that its binder be water-soluble.

Finally, Axel notes the following language in the specification: "[i]t has surprisingly been found that the granules mentioned above are effectively dissolved in the concrete mixer." Axel argues that the word "dissolved" indicates water-solubility. The Court believes that this reading is unduly narrow. Dissolve can mean "to cause to pass into solution (dissolve instant coffee in water)," as Axel suggests. *See* Webster's II New College Dictionary 330 (1995). It can also mean "to cause to disappear (dispel)," "to separate into component parts (disintegrate)," or "to bring to an end by or as if by breaking

10

up (terminate)." *Id*. All of these latter definitions are consistent with the rending apart of the binder by shear forces, a mechanism for promoting pigment dispersal discussed in the specification. Thus, the specification's discussion of the binder being "dissolved" does not limit Claim 1 to a water-soluble binder.

Axel also argues that the prosecution history limits Claim 1 to a water-soluble binder. "The prosecution history gives insight into what the applicant originally claimed as the invention, and often what the applicant gave up in order to meet the Examiner's objections." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978 (Fed. Cir. 1999), *cert. denied*, 120 S. Ct. 1672 (2000) (quoting *Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992)); *see also Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ( "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.").

Two of Axel's prosecution history arguments suffer from the same narrow interpretation of the word "dissolve" Axel urged in reading the '505 patent specification. During the '505 patent prosecution history, the applicant overcame rejections raised by the Examiner based on Japanese patent 149224 ("Japanese patent") and United States Patent No. 4,336,546 ("Edwards patent"). In both instances, the applicant argued that the '505 patent granules more readily dissolved than the granules described in the Japanese patent and Edwards patent, and thus produced homogeneous dispersal of pigment. As previously discussed, dissolve here can mean that the granule binder is moisture-soluble, or that it is

11

susceptible to being broken down by shear forces, or both.  The '505 patent applicant's focus on the ease with which the binder "dissolves" cannot be interpreted as a representation to the Examiner that the '505 patent binder must be water or even moisture soluble.

Axel also relies on a rejection raised by the Examiner concerning United States Patent 4,366,139 ("Kuhner patent").  The '505 patent applicant distinguished the Kuhner patent, stating, "[i]n general, Kuhner deals with the problem of <u>hydrophobic</u> [water insoluble] carbon black as a color pigment.  With the <u>hydrophilic</u> [water soluble] color pigments of the present invention, e.g., manganese oxide and iron oxide, this problem does not occur at all." (original emphasis).  While water-solubility was clearly at issue, it is equally clear that the focus was on the water-solubility of the respective pigments, not the binders.  There is no suggestion that this representation to the Examiner limits the '505 patent to a water-soluble binder, or indeed, concerns the binder whatsoever.

Axel's final argument relies on Dr. Jungk's declaration that when he explained the invention underlying the '505 patent to the patent attorneys who drafted it, he informed them that a water-soluble binder was a necessary element of the invention.  Although he was present, Dr. Jungk did not testify at the hearing.  Further, given Dr. Jungk's personal interest in this litigation, and the fact that this alleged limitation is expressed nowhere in the patent or file history, his declaration is not persuasive. As, the Federal Circuit has made clear, "the inventor's subjective intent as to claim scope, when unexpressed in the patent documents," has no effect on claim construction, and should be disregarded.

12

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996). The Court thus accords no weight to Dr. Jungk's declaration.

In summary, Claim 1 requires at least one binder for promoting the homogeneous dispersal of the pigment in the concrete. The '505 patent specification recognizes at least two types of binder mechanisms for promoting homogeneous dispersal. One is moisture-solubility of the binder. Another is susceptibility of the binder to breakdown by shear forces. There is no indication in Claim 1, the '505 patent specification, or in the prosecution history, that water-solubility of the binder is required. Accordingly, the Court finds that a granule that utilizes a binder that promotes homogeneous pigment dispersal either by moisture-solubility, being more susceptible to shear forces than prior art granules, or both, and otherwise satisfies Claim 1's elements, literally infringes the '505 patent.

        **b.**     **Comparison of Accused Process to Claim 1**

LaPorte's claim against Axel is not for direct infringement, but inducement to infringe. The patent statute provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent. *See Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir.), *cert. denied*, 488 U.S. 968 (1988).

Here, there is no dispute that Axel is actively marketing and selling AXEL'SMARTLINS. Pavestone, Inc. is one of Axel's customers, and has used

AXEL'SMARTLINS to pigment concrete. Accordingly, if the use of AXEL'SMARTLINS infringes Claim 1 of the '505 patent, there is no question that Axel has actively induced such direct infringement by its customer.

In Axel's briefing, expert's report, and at the preliminary injunction hearing, Axel has not disputed that AXEL'SMARTLINS fall within all elements of Claim 1 except the binder element. Specifically, Axel has conceded that AXEL'SMARTLINS: (1) are pigment-containing granules other than compacted or briquette granules; (2) each granule consists of at least one pigment selected from the group consisting of manganese oxide and iron oxide; (3) at least 90% of the granules have a particle size of about 20 microns or more; and (4) the finite water content of the granules is not in excess of about 4.2%. The only lingering question is whether the binder used in AXEL'SMARTLINS is used to promote the homogeneous dispersal of pigment in the concrete.

Relying on its urged interpretation of the '505 patent, much of Axel's argument aims to establish that its binder is not water-soluble. Because Axel's interpretation of the patent has been rejected by the Court, as previously discussed, the fact that Axel's binder may be water-insoluble is not dispositive. The question of water-solubility is still relevant, however, as moisture-solubility, a related mechanism, is identified as a specific means of promoting homogeneous dispersal in the '505 patent. Further, even if the AXEL'SMARTLINS binder is not water-soluble or moisture-soluble, the Court must still determine whether any evidence suggests that Axel's binder promotes homogeneous

14

dispersal of pigment through some other mechanism.  Accordingly, the Court examines the evidence concerning Axel's binder.

Axel utilizes a particular formulation of a product trade named "NeoCryl" as the AXEL'SMARTLINS binder.  NeoCryl is a styrene/acrylic copolymer resin in the broad family of polyacrylate resins.  Although NeoCryl is purchased as a milky white emulsion of polymer "droplets," it dries into a hard, glossy substance.  Axel contends that, after drying, NeoCryl is not water-soluble.  The NeoCryl product literature supports this opinion, stating "formulations based on NeoCryl . . . exhibit high gloss, excellent hardness and block resistance, and *good water soak resistence*."

Laporte does not dispute Axel's chemical identification of NeoCryl.  Indeed, Laporte's expert, Dr. James Stoffer, confirmed the AXEL'SMARTLINS binder to be a polyacrylate binder through his independent infra-red spectroscopy analysis.  Further, in its briefing, Laporte does not dispute Axel's contention that its binder is water-insoluble.  During cross-examination of Dr. Jolicoeur, however, Laporte's counsel asked several questions concerning a jar of liquid, which he represented was AXEL'SMARTLINS dissolved in water and an undisclosed quantity of Drano, a commercial pipe declogger.  This line of questioning suggested the possibility that NeoCryl may be moisture-soluble in concrete mix.  Laporte, however, failed to adduce sufficient evidence to support this theory.  The jar of water experiment Laporte alluded to at the hearing cannot support its argument because of several foundational problems with the experiment.  At the hearing, it was revealed that the AXEL'SMARTLINS had been submerged in the jar of water and

15

Drano solution for more than twenty-four hours. Both parties indicated that the industrial concrete pigmenting processes described in the '505 patent and in Axel's product literature typically take place in less than two minutes. This substantial time disparity renders Laporte's experiment nonprobative. The concoction of Drano and water used in the experiment creates other foundational problems. No indication was provided as to how much Drano was used, what the pH of the solution in the jar was, or whether there was any similarity between the conditions in the jar and the conditions one would expect to find in concrete mix. Without answers to these questions, the experiment is unpersuasive.

Nor has Laporte provided any indication as to how the binder in AXEL'SMARTLINS functions, if at all, to promote homogeneous dispersal of pigment in cement. Laporte's expert, Dr. Stoffer, did testify that he performed experiments establishing that AXEL'SMARTLINS performed just as well as granules made as described in the '505 patent[4] ("'505 patent granules") in producing homogeneously pigmented concrete. He mixed batches of concrete in accordance with the instructions described in the '505 patent specifications, first using granules made as described in the '505 patent and then using AXEL'SMARTLINS. Dr. Stoffer testified that the results

---

[4]The Federal Circuit prohibits comparing an accused product with commercial embodiments for patented invention to show infringement. *See Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1381 (Fed. Cir. 1998). Accordingly, instead of comparing AXEL'SMARTLINS to Granufins, Laporte's commercial granule, Dr. Stoffer manufactured his own pigment granules using the instructions set forth in the '505 patent.

16

obtained from each batch were identical. From this he concluded that AXEL'SMARTLINS homogeneously pigmented concrete just as well as granules made as described in the '505 patent.

While Dr. Stoffer's experiment suggests that AXEL'SMARTLINS, as a whole, perform similarly to '505 patent granules in producing homogeneous pigmentation of the end product, it does not reveal the specific function of the AXEL'SMARTLINS binder in this process. The Court pressed Dr. Stoffer concerning this distinction during the hearing, with little success:

> THE COURT: How do you know it was the binder that operated in the same way?
>
> DR. STOFFER: The pigment materials are similar. We can't say they're identical because they have different sources. I have actually run samples where I made granules with their binder and with binders such as Laporte uses and made samples, and they acted the same way. So in my visual testing, in my operation, I have actually prepared samples, and they appeared the same with the same starting pigment. That was one of my conditions I requested. We actually went and ran a plant for several days, prepared samples of granules with the same starting iron oxide because pigments vary a little bit with time and with source. I'm sorry, with source. So I wanted to make sure that I had exactly the same pigment. I got that. I used the same chemicals that Axel J. uses in their process and the chemicals that Laporte used. I went through the whole process, we made samples, and they came out the same.

*See* Hearing Tr. at 79, ln. 1; 80, ln. 1. Despite this very specific question, Dr. Stoffer provided no explanation of how the AXEL'SMARTLINS binder functions.

The crucial question of how the AXEL'SMARTLINS binder functions to promote homogeneous dispersal of pigment, if at all, is thus unanswered. The evidence currently suggests that one mechanism for promoting homogeneous dispersal described by the '505

17

patent, moisture-solubility, is not needed to make AXEL'SMARTLINS work effectively. It is possible that the binder in AXEL'SMARTLINS, however, promotes homogeneous dispersal by being more susceptible to shear forces than prior art granules. Under the Court's construction of Claim 1, this would constitute literal infringement of the '505 patent. It may also be that the binder functions to promote homogeneous dispersal of pigment by some other method. It may be, however, that the binder serves no such function, and that the homogeneous dispersal of pigment in the final product is due to some other element of AXEL'SMARTLINS. The evidence currently before the Court does not prove that one of the former possibilities is more likely than the latter.

Because Claim 1 of the '505 patent defines the binder solely in terms of its function, and because Laporte, as the movant, bears the burden of proving a reasonable likelihood of success, Laporte's omission is fatal to its motion. By failing to present evidence regarding how the AXEL'SMARTLINS binder functions to promote homogeneous dispersal of pigment, if in fact it does, Laporte has left the Court unable, from the current record, to find that Laporte has a reasonable likelihood of proving literal infringement,[5] and thus succeeding on the merits.

---

[5] In its briefing, Laporte's arguments are limited almost exclusively to literal infringement. Its sole mention of the doctrine of equivalents is in a footnote, in which it reserves the issue for trial. *See* Laporte's Suggestions in Support of its Motion, p. 19, n.10. Axel stated its understanding that based on Laporte's footnote and lack of argument, the doctrine of equivalents was not at issue on the motion for a preliminary injunction. The doctrine of equivalents requires Laporte to show that the accused process performs substantially the same function in the same way to achieve substantially the same result. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). Based on the record before this Court, there is no basis for determining the likelihood of success on the merits of this theory although it would appear to fail for the same

## B. Remaining Issues

The Court's finding that Laporte has failed to establish a reasonable likelihood of success on the merits mandates denial of the motion for a preliminary injunction. Accordingly, no further inquiry is necessary. *See Vehicular Techs.*, 141 F.3d at 1088; *International Communication Materials, Inc. v. Ricoh Co., Ltd.*, 108 F.3d 316, 319 (Fed. Cir. 1997) (The "district court's tentative claim construction and its resulting finding on the likelihood of successfully proving infringement [in the negative], . . . form an adequate basis for our affirming its denial of the preliminary injunction.").

## III. Conclusion

For the above-stated reasons, it is hereby

ORDERED that Plaintiff's Motion to for Preliminary Injunction [Doc. # 5] is DENIED.

Dated: August 18, 2000  /s/ Nanette K. Laughrey
Kansas City, Missouri  NANETTE K. LAUGHREY
United States District Judge

---

reasons that the literal infringement theory failed.